## Case No. 9,426.

### MENDENHALL v. CARTER.

[7 N. B. R. 320.] [1]

District Court, W. D. North Carolina.　1872.

BANKRUPTCY—ACT OF—STOPPING PAYMENT—COMMERCIAL PAPER—CONFEDERATE CURRENCY.

1. A debtor does not commit an act of bankruptcy who stops payment of a note, given long before the passage of the bankrupt act [of 1867 (14 Stat. 517)] and does not resume payment subsequent thereto, up to the filing of the petition in bankruptcy.

[Cited in Re Brewer & Bemis Brewing Co., Case No. 1,850.]

2. A note payable in money is commercial paper, although at the time of its execution Confederate currency was the only medium of exchange in the section of the state where the note was given. Petition dismissed.

This is a creditor's petition, filed on the 24th day of June, 1871, to obtain an adjudication of bankruptcy against Thomas D. Carter. The debt of the petitioner is "for the sum of $600, money had and received of petitioner by the said Thomas D. Carter, to the use of petitioner, on the 15th day of July, 1870," etc. The petitioner further represents—"That within six calendar months next preceding the date of this petition, the said Thomas D. Carter did commit an act of bankruptcy within the meaning of said act, to wit: In that, in the month of July, 1863, the said Carter was a trader, and in the said month executed to W. A. Caldwell, cashier of the Farmers' Bank of North Carolina, his certain promissory note for the sum of $4,123.71, payable in one hundred and eighty days after date; that said note was commercial paper," etc.; that said money was used as a trader, etc.; that no part was paid up to the 17th day of May, 1871, etc.; "and therein said Carter has stopped and not resumed payment of his commercial paper within a period of fourteen days," etc.

A demurrer was filed by respondent, and upon the argument it was agreed by counsel that only the following questions of law should be considered and decided by the court: First. The respondent stopped payment before the passage of the bankrupt act, and did not resume payment subsequent thereto up to the filing of the petition. Was

[1] [Reprinted by permission.]

this an act of bankruptcy? Second. Is the note described in the petition commercial paper?

DICK, District Judge. I have not been able to find any case in our courts in which the precise point first presented has been considered and determined. On the argument, my attention was called to the case of Baldwin v. Wilder [Case No. 806], as deciding an analogous question, and the counsel insisted with much earnestness and force, that the principles there announced ought to govern the case before us.. Mr. Hilliard, in his work on "Bankruptcy" (page 20), in speaking of the time when acts of bankruptcy may be committed under the English statutes, says: "An act committed before the passage of the statutes is not sufficient to support a commission," and several cases are cited as authorities. I have not had an opportunity of examining those cases to see whether they throw any light upon the question before us. In determining this case, I will, in the first place, inquire what is the fair and reasonable construction of the clause in the statute upon which this proceeding is founded; and then consider the opinion of the learned judge in the case above mentioned. The primary rule (sometimes called the golden rule) in the construction of statutes, is to give to all the plain and unambiguous words of a statute their literal and ordinary meaning, unless manifest absurdity or injustice would be caused by so doing. Another rule of great practical importance is, "that a statute must in general, on principles of obvious convenience and justice, be construed as prospective and not retrospective in its operation: it must be considered as intended to regulate the future conduct of persons, and not apply to past transactions." Broom, Com. Law, 6. This rule should be observed unless the terms of the statute plainly show a contrary legislative intent. The act of bankruptcy alleged in the petition is that the respondent "has stopped and not resumed payment of his commercial paper within a period of fourteen days." As the promissory note mentioned in the petition was not paid at maturity, the act of stopping payment occurred one hundred and eighty-three days after date, more than three years before the passage of the bankrupt law, March 2, 1867, and the non-resumption of payment continued up to the 17th day of May, 1871, just before the petition was filed. The allegation that the respondent was a trader, etc., was not denied, and is not deemed material in the construction of the statute since the amendment of the 14th July, 1870 [16 Stat. 276]; for the act of bankruptcy alleged may now be committed by any person who executes commercial paper and fails to make payment within a period of fourteen days after maturity. In re Hercules Assurance Co. [Case No. 6,402].

To constitute this act of bankruptcy, two things must concur, and one necessarily precedes the other. 1. The debtor must fail to pay his commercial paper at maturity. 2. He must fail to resume payment within a period of fourteen days. If payment should be made in twenty days after suspension, this will not do away with the act of bankruptcy. The active words in the statute to express these two requirements are—"stopped or suspended" and "not resumed payment." These are plain and unambiguous words when used together, and must be separately and literally construed. The words "stopped or suspended" are sometimes used to denote not only the act of stopping, but, also, the not resuming payment; and if they were the only words used in the statute they would express both ideas. Congress has seen proper to use both expressions, and connect them together with the ordinary conjunctive conjunction. We must take it for granted that congress in framing such an important and carefully considered statute, used the words "ex industria," and with the purpose of conveying the different significations which they literally express.

The 39th section, as amended July 14th, 1870, after leaving out intermediate and inapplicable words and clauses, would read as follows: "That any person residing and owing debts as aforesaid, who, after the passage of this act, has stopped or suspended and not resumed payment of his commercial paper within a period of fourteen days, shall be deemed to have committed an act of bankruptcy," etc. In construing this section according to the plain and literal meaning of the words used, we conclude that the respondent, having stopped payment before the passage of the statute, the subsequent non-resumption of payment of his commercial paper did not constitute an act of bankruptcy.

The petitioner's counsel on the argument insisted that the non-resumption of payment by the respondent of his dishonored commercial paper subsequent to the bankrupt law was a continuous act of bankruptcy, and the case of Baldwin v. Wilder, supra, was relied on as authority, and the counsel seems to be sustained in his views by the reasoning of the learned judge in that case. We have great respect for the ability, learning, and high reputation of Judge Emmons, but we cannot adopt his opinion in the decision of the case before us. We think, as we have before indicated, that the words "stopped" and "not resumed" have distinct significations. There cannot be a condition of non-resumption without a previous stopping of payment, but the words. as used, have a different relation as to time in the transaction. A fraudulent stopping of payment is an immediate act of bankruptcy, and no subsequent resumption will free the fraudulent debtor from an adjudication of bankruptcy, if proceedings are commenced within six months. In this clause of the statute the word "stopped" refers to the time of the immediate act, and the question of non-resumption does not arise, and the words "not resumed" are not used. In the subsequent clause, where a stopping of payment which is not fraudulent is provided for, the words "stopped" and "not resumed" are both used, one with reference to the time when the paper was dishonored according to the law merchant and the other with reference to the fourteen days of grace allowed by the bankrupt law. In this case, stopping is an inchoate act of bankruptcy, which is completed by a failure to make payment for fourteen days. We think, therefore, that the stopping as well as non-resumption of payment of commercial paper must both have occurred after the 2d of March, 1867, to come within the provisions of the statute.

"Is the suspension an indivisible act, that, once committed, is not continuing? The law is full of analogies to the contrary." Baldwin v. Wilder [Case No. 806]. This terse expression of judicial opinion was cited on the argument, and ably enforced by counsel, with many analogies from the law. Even were we to admit the principle announced, it would not apply to our case. There are many acts recognized in law as continuous in their nature, but the act continued is always of the same character as when it began. Thus a nuisance is continuous, but it commences a nuisance. A permanent trespass is continuous, and may be so alleged in pleading; but it was a trespass ab origine. In our case, the stopping and not resuming payment for three years before the statute was passed was not an act of bankruptcy, and the subsequent non-resumption is not declared to be such act in the statute. I cannot concur with Judge Emmons in speaking of this act of bankruptcy. "Every fourteen days' suspension, no matter how often repeated, or how long continued, are but successive acts of bankruptcy." Why should we have successive acts of bankruptcy accruing at every period of fourteen days, when the first act under the statute will exist for six months for the purpose of commencing proceedings? I agree to the proposition that this is a remedial and beneficial statute, and should be liberally construed; but the indulged debtor under the law has some rights as well as the creditor, and a "statute of repose" is as much needed in bankruptcy matters as in any other legal proceedings.

If the act of stopping payment is fraudulent, can it be indefinitely continued by constructive succession, and proceedings be commenced ten years after the first occurrence of the act? If so, the six months' limitation in the statute is useless verbiage, and should be taken out, as it is well calculated to mislead not only merchants and traders, and those who deal with them, but also lawyers. If the limitation applies in a case where there

is fraud, it certainly ought to apply where there is no fraud. When a trader fails to pay his commercial paper when due, or within the three days of grace allowed by the custom of merchants, he is regarded as commercially insolvent. The bankruptcy law allows fourteen additional days of grace to commercial paper, and if payment is not made within that time, the maker is insolvent in contemplation of the statute. If the statute has used only the words "stopped or suspended payment of commercial paper," then three days of grace would have been allowed for payment by operation of the law merchant; and could it be properly said that every subsequent period of three days' non-payment constituted successive acts of bankruptcy, and that the six months' limitation would not apply? The additional days of grace allowed by the bankrupt law certainly cannot have the effect of rendering such limitation nugatory. We think that this six months' provision was intended by the framers of the law to operate as a limitation on bankrupt proceedings, and was prompted by the same wise and beneficent spirit of legislation which has given rise to all statutes of limitation, both in this country and in England. The act of bankruptcy which we are considering, originally, could only be committed by bankers, merchants, traders, etc., in the course of their dealing, and the provision in the statute was intended to secure punctuality, regularity and uniformity in commercial transactions. To secure this result there must be action both on the part of the debtor and the creditor. The debtor is required to pay at maturity, or within a period of fourteen days, and the creditor to demand and enforce payment within six months after the commercial paper which he holds is dishonored.

In commercial cities where the custom of merchants is well regulated, understood, and strictly enforced, a trader who fails to meet his commercial paper at maturity loses at once his financial credit, is regarded as insolvent, and is generally forced to wind up his business. This was the custom of merchants before the passage of the bankrupt law, and no injustice or injury is done to creditor or debtor by the six months' limitation, as both parties understand their rights and obligations, and no further time is needed to commence proceedings in bankruptcy. When the holder of dishonored commercial paper gives indulgence to the maker for more than six months, he shows, by such conduct, that he is either satisfied that the debtor is solvent in the ordinary sense, in having property sufficient to pay all of his debts, or he relies upon collateral securities, or he is willing to resort to the ordinary remedies furnished by the common law for the collection of his claim. Such a creditor, by allowing such indulgence to his debtor, gives him credit in the community and enables him to enter into business engagements with other parties; and it would open a wide door to injustice and

oppression, if such creditor could, at any indefinite time, intimidate the debtor and his friends by threats of proceedings in bankruptcy. If this limitation is just and wise in its operation in commercial cities, it will apply with more justice and force in the rural districts, where the custom of merchants is but little understood, and can hardly be said to regulate, practically, the business transactions of merchants and traders, and much indulgence is shown by creditors.

We can carry the argument still further by referring to the condition of things produced by the amendment of July 14th, 1870. Now, any person who executes commercial paper is liable to commit the act of bankruptcy insisted on in this case. Heretofore, in the ordinary dealings among our people, promissory notes were usually secured by responsible sureties, and by the indulgence of holders, were allowed to remain overdue for many years. When this amendment is generally understood, it will have the effect of doing away with the loose credit system which has so long prevailed in many sections of the country. A man who now executes his promissory note must not only be solvent in the ordinary acceptation, in having property sufficient to pay all of his debts, but he must also be solvent in a commercial sense, in having money to meet such note at maturity, or he may be forced into bankruptcy. As the statute requires such strict punctuality on the part of the debtor, he ought to be allowed the benefit of the limitation where the creditor by negligence or designed indulgence fails, for six months, to enforce the statutory remedy. The evident policy of the statute is to make creditors, as soon as possible, avail themselves of the extraordinary remedy provided, in order that business matters may be kept in a condition of commercial solvency, and the maxim, "vigilantibus non domientibus jura subveniant," ought to apply with more force than it does to the ordinary remedies provided by the common law. Broom, Leg. Max. 692. In our construction of the statute in giving force to the literal signification of the words used, we feel that we are not obnoxious to the charge: "Qui hoeret in litera, hoeret in cortice;" for our construction gives effect to the manifest legislative intent, and is consistent with the "reason of the thing."

We find but little difficulty in disposing of the other question presented in the argument. By a statute of this state, promissory notes, payable in money, are placed on the same footing as inland bills of exchange, and are controlled and regulated by the custom of merchants. The note in this case is payable in money; and although at the time of its execution, Confederate currency was the only medium of exchange in this section of the state, the lex loci did not make such currency a legal tender in the payment of debts. The ordinance of the 18th of October, 1865, declares, in substance, that executory con-

tracts like the one before us, "shall be deemed to have been made with the understanding that they were solvable in money of the value of said currency"—"subject, nevertheless, to evidence of a different intent of the parties to the contract." [Ord. N. C. 1865–66, p. 20.] Where the nature of such contract is not set forth in the instrument, Act 1866, c. 38, allows the parties to show in evidence the property or other consideration for which the contract was executed, etc. Act 1866, c. 39, establishes a scale of depreciation of Confederate currency, etc. These statutes have been recognized as constitutional by the supreme court of this state, but they do not affect the character of this note as commercial paper. The parties may show a collateral contract, which may change its value, and it may be subject to the scale of depreciation; but still it is negotiable and payable in money, and is commercial paper. If the non-resumption of payment alleged in this case was held by me to be a continuous act of bankruptcy, I would also hold that the said ordinance and statutes so far changed the rights and obligations of the parties to this note, as to excuse the respondent for not making payment until the real value of the note was legally ascertained and established, as provided by said legislation. As I have been upon the bench of this court but a few months, and this is my first opinion in a case of bankruptcy. I am gratified that the petitioner can have an opportunity of having my decision reviewed in a higher court. It is ordered that the petition be dismissed.